UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CENTRAL MICHIGAN COMMUNITY
HOSPITAL, a Michigan non-profit corporation,

        Plaintiffs,

                                          Case Number 06-10220-BC
v.                                        Honorable Thomas L. Ludington

FEDERAL INSURANCE COMPANY,
a foreign insurance corporation,

        Defendant.
_____ /

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT, DENYING MOTIONS AS MOOT,
AND SCHEDULING EVIDENTIARY HEARING**

        The plaintiff initiated this action in the Isabella County, Michigan Circuit Court on December 14, 2005. The defendant subsequently removed the matter to this Court on January 17, 2006 on the basis of federal diversity jurisdiction. The complaint states two causes of action arising out the defendant's alleged failure to pay claims relating to a July 2004 sump pump malfunction at one of its Mount Pleasant facilities and resulting damages to its medical records. The first count asks the Court to "declare that the policy does not limit the claim of Plaintiff by the policy's fungus exclusion provision for reimbursement for its losses." Compl. at ¶ 29. The second count seeks damages as a result of breach of the insurance contract. Presently before the Court is the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all counts of the complaint.

        Also before the Court are several additional motions filed by the parties. The plaintiff filed a motion to strike the defendant's witnesses, a motion to strike the defendant's expert witness, and a motion to compel payment of payment of its expert Denlo Malzahn's fees with respect to his

deposition testimony. The defendant has filed two motions *in limine*. The first seeks to preclude the testimony of Malzahn and the second asks the Court to prevent the testimony of Dr. Mark Banner, an individual who consulted on the potential health ramifications of mold discovered at the plaintiff's facility. The parties have filed responses in opposition to the respective motions, and the Court heard oral argument on January 31, 2007.

At the conclusion of the hearing, the Court granted in part and denied in part the defendant's motion for summary judgment. The parties conceded that the policy covered the plaintiff's "valuable papers," here medical records, up to $250,000. *See* Def.'s Mot. Summ. J. Ex. M, Insurance Policy (providing" "we will pay for direct physical loss or damage to valuable papers caused by or resulting from peril not otherwise excluded, not to exceed the applicable Limit of Insurance for Valuable Papers") Def.'s Mot. Summ. J. Ex. M, Insurance Policy. The defendant reimbursed the plaintiff $197,569.37 for restoration of it patients' records, which included freeze drying, ozoning, and disinfecting the documents in the basement of the plaintiff's facility that were damaged from the water intrusion caused by the sump pump malfunction.

The insurance policy also contained a provision limiting coverage relating to "fungus clean up" for up to $25,000. The policy states, in relevant part:

> *Fungus Clean-up Or Removal*   We will pay the costs you incur to clean up, remove, restore, or replace covered Removal property because of the presence of fungus at the premises shown in the Declarations

The policy further includes a general exclusion for fungus:

> *Fungus   This insurance does not apply to loss or damage:*
> - *which is fungus*
> - *which is anyway attributed to the presence of fungus; or*

-2-

> • *caused by or resulting from fungus,*
>
> *regardless of any other cause or event that directly or indirectly:*
>
> • *contributes concurrently to; or*
> • *contributes in any sequence to,*
>
> The loss or damage, even if such cause or event would otherwise be covered
>
> This Fungus exclusion does not apply:
>
> A.  when the presence of fungus results from:
>
> > 1. explosion;
> > 2. fire;
> > 3. leakage from fire protection equipment; or
> > 4. lightening; or
>
> B.  to the extent insurance is provided under the Fungus Clean-up or Removal Premises Coverage

*Ibid.*(emphasis added). The defendant has reimbursed the plaintiff the full $25,000 policy requirement.

The parties' dispute arises from the defendant's denial of coverage for a second stage of records' restoration. The water intrusion occurred on July 18, 2004 when a sink overflowed as a result of the sump pump malfunction. The overflow caused water to flow from the floor above into the basement where the medical records were stored. The plaintiff contracted with Electronic Restoration Services (ERS) to ozone, treat, and disinfect the records. All the records were removed from the basement and placed in storage for treatment. Thereafter, a decision was made to treat wet records and return dry documents to the plaintiff.

The plaintiff maintained and presented evidence that it was Clare Wasek, the insurance adjuster hired by the defendant, who made the decision to restore only visibly-wet documents. *See*

Pl.'s Resp. Br. Ex. A, Letter (letter between the plaintiff and the Chubb Group, the holding company of the defendant, stating: "Mr Wasek instructed ERS to return, immediately, boxes of files that were not visibly wet and did not have any visible growth on them"). The defendant disputed this fact. On the contrary, the defendant contended that Lee Capitina, owner of ERS, testified at his deposition that he returned only files "that [the plaintiff] needed as part – to keep their operation running . . . [Wasek] didn't ask me to return the files. Def's Mot. Summ. J. Ex. F, Capitina dep at 156-57. *See also* Def.'s Mot. Summ. J. Ex. U, Wasek aff. at ¶¶ 4-9.

This factual dispute notwithstanding, on or about September 10, 2004, ERS began returning records to the plaintiff. Before the records were returned, Kelly Hiefner, the plaintiff's record custodian, examined the records. Tim Wentworth, a custodian employed by the plaintiff, confirmed the plaintiff took on the responsibility of cleaning the basement "following what they understood was protocol for sanitizing and decontaminating the area and replaced any visibly wet or water stained shelving." Pl.'s Resp. Br. at 14; *see also* Def.'s Mot. Summ. J. Ex. H, Wentworth dep at 34-35. There also was testimony from Lee Capitana that ERS examined "each and every" file before shipping them to the plaintiff. Capitana dep. at 34. In addition, Wasek averred that "[o]n September 13, 2004, Debbie Knope of ERS confirmed that there no . . . issues with the records and that the records were in the process of being returned to CMCH and that CMCH personnel were unpacking and inspecting medical records themselves." Wasek aff. at ¶ 9.

On September 22, 2004, during a routine inspection of heating installations, mold was discovered in certain ducts. The plaintiff ultimately hired ServPro, a company dealing in mold remediation, to address this issue. On approximately September 24, 2004, the plaintiff noticed that three boxes of records were visibly wet and promptly returned them to Debbie Knope at ERS.

-4-

On September 27, Dr. Mark Banner of Mold Free, an individual with whom the plaintiff contracted, undertook an "environmental inspection." However, according to his deposition, his role was limited to "basically [to] the facility – was it necessary to close the facility because they were concerned with health issues [arising from mold]." Def's Mot. Summ. J. Ex. J., Banner dep. at 13. Thereafter, both the defendant and ERS hired consultants to look into the mold discovered in the duct work. The defendant engaged IAQ Management, Inc., which observed the premises on October 2, 2004 and issued a report on October 5, 2004. As the plaintiff points out, however, this report "contained initial recommendations for likely claim-related damage to the structure. It did not address unrelated damage, cause and origin of the damage nor specific inspection observations." Pl's Resp. Br. at 16.

ERS engaged both the Traverse Group and IAQ. The Traverse Group inspected the premises on October 18, 2004 and issued its report on October 26, 2004. This report did address mold on the medical records and concluded, among other things, that "[t]he low amount of mold spores on file folders indicates the possibility of background mold spores that may be unrelated to the water intrusion event." Def.'s Mot. Summ. J. Ex. K, Traverse Report at 3. On December 30, 2004, IAQ inspected medical records and completed a report on January 25, 2005. Among other things, IAQ made the following observation:

> It should be noted that microorganisms (e.g. bioarosols) such as mold, bacteria, yeasts, and algae are found where sufficient moisture, temperature, and food is available – such conditions are common to the outdoor environment and often observed in the indoor environment. Many such bioaresols are naturally occurring organisms and are a benefit to the environment. Therefore, mold spores are always present on contents and files. However, the presence of mold growth is unusual and indicates potential source of airborne contamination.

Def.'s Mot. Summ. J. Ex. L, IAQ Report (Jan 25, 2005).

The plaintiff contends that both companies suggested photocopying or encapsulating records that showed visible fungus contamination. However, ERS felt the cost of photocopying was in the plaintiff's words "completely beyond all economic reason," and that treatment using gamma radiation [on select documents] was the "[m]ost cost effective way" to proceed. Pl.'s Resp. Br at 17. Nonetheless, at some point after the return of the treated files by ERS and the solicitation of consultant reports, ERS recommended, and the plaintiff agreed to, removing all the records that already had been returned to the basement for additional treatment involving gamma radiation. ERS charged the plaintiff $129,903.66 for this work. The plaintiff then sought reimbursement from the defendant for the additional expense, which the defendant, as noted, denied.

The defendant argued that although coverage extended to the plaintiff's records, the policy contained a clear limit of $25,000 for "fungus clean up" and otherwise included a general fungus exclusion, as set forth above. It further insisted that the sole purpose of the second stage of records' restoration was to address later developed fungus or mold related issues. The plaintiff does not dispute that the defendant paid ServPro $25,000, the maximum amount of coverage for fungus cleanup under the policy.

Instead, the plaintiff argued that the defendant is responsible for the costs associated with the second stage of restoration because Wasek directed that the files that were not visibly wet be returned to the premises. Also, the plaintiff argued that the additional expense of gamma radiation would have been avoided if Wasek had not directed ERS to return the records that were not visibly wet in the first instance. Finally, the plaintiff contended that the discovery of mold spores on the records was a direct result of "a covered peril," namely the water intrusion and high levels of humidity in the basement.

In Michigan, it is well established that construction of an insurance contract is to be determined in the first instance by the Court as a matter of law. *Sunshine Motors, Inc. v. New Hampshire Insurance Co.*, 209 Mich. App. 58, 59, 530 N.W.2d 120, 121 (1995); *Mueller v. Frankenmuth Mutual Ins. Co.*, 184 Mich. App. 669, 671, 459 N.W.2d 95, 96 (1990). The starting point in the construction of any written contract is the language of that document. *Michigan Millers Mutual Ins. Co. v. Bronson Plating Co.*, 445 Mich 558, 567, 519 N.W.2d 864, 868 (1994). If the terms of an insurance agreement are unambiguous, the Michigan Supreme Court has held, the Court must enforce that agreement in accordance with those terms.

The Court accepted the plaintiff's assertion that Wasek directed the return of the medical records that were not visibly wet from the water intrusion for purposes of the motion, but concluded that the unambiguous language of the insurance contract nonetheless limits the defendant's exposure to mold-related issues to $25,000. It is undisputed that the defendant paid this amount, and the later discovery of mold cannot fairly be read under the policy to be a direct loss resulting from the water intrusion. Indeed, the insurance agreement contained an unambiguous "anti-concurrent" fungus exclusion. As noted, the policy plainly states " [t]his insurance does not apply to loss or damage: which is fungus [;]which is anyway attributed to the presence of fungus; or caused by or resulting from fungus*, regardless of any other cause or event that directly or indirectly: contributes concurrently to; or contributes in any sequence to, the loss or damage, even if such cause or event would otherwise be covered.*" Ex. M, Insurance Policy (emphasis added) (format altered). Thus, Wasek's alleged actions were consistent with the terms of the plaintiff's coverage.

There is, however, one exception. Taken in the light most favorable to the plaintiff, there is evidence that three visibly-wet boxes of records were erroneously returned to the plaintiff after ERS

-7-

completed its process of freeze-drying, ozoning, and disinfecting the documents. As a result, there is no factual dispute as to whether the exposed moisture remaining in these boxes and the records contained therein resulted from the water intrusion and therefore was a covered peril under the policy. The only question is whether the defendant reimbursed the resulting expenses. The Court extended the plaintiff an opportunity to present additional evidence explaining, what, if any, economic loss is attributable to these records.

The plaintiff also argued in its brief and at the hearing that the defendant breached the insurance agreement by failing to pay the costs associated with Dr. Mark Banner's "environmental inspection" because that expense fell under the policy as "preparation of loss fees." The Court could find no basis in the policy for coverage, especially in light of the specific exclusion for "consultants." *See* Def.'s Mot. Summ. J. Ex. M, Insurance Policy (stating "[t]his Additional Coverage does not apply to any expenses you incur for any: Insurance adjuster, consultant, or attorney; or of your subsidiaries or affiliates"). The plaintiff further claimed approximately $11,000 in unpaid storage fees for its medical records. However, the plaintiff acknowledged during the hearing that the storage fees were incurred well after the first phase had been completed and the fungus was located in the heating system of the building. The Court therefore granted the defendant's motion for summary judgment in this respect.

Although not addressed at the hearing, the parties disputed in their papers whether two months of rent that the plaintiff waived to a physician tenant, allegedly because his practice was disturbed during remediation efforts, was a covered loss of business income. The plaintiff did not specifically allege this breach in its complaint; however, the Court finds in the interest judicial economy and in light of the liberal provisions for the amendment of complaints under Federal Rule

of Civil Procedure 8 and the modest amount at issue, this claim should be appropriately addressed here. There was testimony from the plaintiff's vice president of quality and physician services that it was required to waive rent for a physician because of the intrusion of the restoration and remediation efforts. Def.'s Mot. Summ. J. Ex. C, McCoy dep. at 242-245. The defendant disputes this assertion suggesting most of the remediation work was performed on weekends or during the evening hours. The defendant also complained that the plaintiff had not come forward with a specific amount of loss. However, the Court believes there is factual dispute concerning the loss of business income, which is subject to the plaintiff's proof of the exact amount.

The remaining motions, save for one, are moot in light of Court's conclusion that only three boxes of records arguably fall within coverage under the policy. The motion challenging Malzahn's fees for preparation for his deposition, however, requires further explication. The plaintiff maintained at the hearing that Malzahn's fees all resulted because of his need to prepare for his deposition. The defendant insisted that Malzahn's fees were not the result of preparing for his deposition, but rather general preparation for testifying at trial. As a result, the Court believes a brief evidentiary hearing involving Malzahn's specific efforts is necessary to resolve the apparent dispute.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt # 40] is **GRANTED IN PART** and **DENIED IN PART** for the reasons stated on the record and in this order.

It is further **ORDERED** that the plaintiff's motion to strike the defendant's expert and other witnesses [dkt #s 27, 38], and the defendant's motions *in limine* [dkt #s 41, 42] are **DENIED** as moot.

It is further **ORDERED** that the parties appear for an evidentiary hearing on **April 9, 2007**

**at 2:30 p.m.** At the hearing, the Court will hear testimony from Malzahn and permit the plaintiff an opportunity to present evidence of economic damages associated with the three visibly-wet boxes returned to it and the amount of rent that was waived to one of its tenant physicians allegedly resulting from remediation efforts.

                                                                     s/Thomas L. Ludington  
                                                                     THOMAS L. LUDINGTON  
                                                                      United States District Judge

Dated: February 6, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 6, 2007.

                                                  s/Tracy A. Jacobs  
                                                  TRACY A. JACOBS